UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEBRA A. YOST,

              Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

              Defendant.

C15-1279 TSZ

ORDER

THIS MATTER comes before the Court on appeal from a final decision of the Acting Commissioner of the Social Security Administration ("Commissioner") denying plaintiff Debra A. Yost's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-434 and 1381-1383f.  Having reviewed all papers filed in connection with the appeal, the Court enters this order.

**Background**

Plaintiff was born in 1964, completed high school, and worked as a receptionist for many years.  AR 35, 43, 296-301.  She has not, however, engaged in substantial gainful activity since August 2, 2008, which she alleges was the onset date of her disability.  AR 19.  Plaintiff applied for DIB and SSI benefits in 2012.  AR 284-92.  In denying her application, Administrative Law Judge ("ALJ") Tom L. Morris determined

that plaintiff has the following severe impairments:  "degenerative disc disease of the

thoracic and cervical spines, right wrist de Quervain's tenosynovitis,[1] an affective

disorder, and generalized anxiety disorder."  AR 19.  ALJ Morris further concluded that

plaintiff has the residual functional capacity to perform, with certain limitations, a range

of "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  AR 21.

According to ALJ Morris, although plaintiff's residual functional capacity does not

enable her to engage in past relevant work, she can make an adjustment to other

occupations (for example, document preparer, final assembler, or patcher) as to which a

significant number of jobs exist in the national and regional economy.   AR 25-26.

As a result, ALJ Morris ruled that plaintiff "has not been under a disability . . . from

August 2, 2008, through the date of [his] decision," which was issued on January 31,

2014.  AR 26-27.  The Appeals Council denied plaintiff's request for review.  AR 1-4.

　　　　Plaintiff now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3).  She presents six issues for the Court's consideration:  (1) whether the

administrative record is complete;[2] (2) whether ALJ Morris properly declined to recuse;

---

[1] Plaintiff also has de Quervain's tenosynovitis in her left wrist, _see_ AR 386-88, but ALJ Morris deemed it "nonsevere" because "her symptoms resolved following an injection," AR 19.  _See also_ AR 52 (plaintiff testified that she "got a cortisone shot and it was better").

[2] Plaintiff asserts that the administrative record is deficient in two ways:  (i) the omission of exhibits attached to her attorney's letter dated September 20, 2013 (the letter itself is included at AR 250-82); and (ii) the omission of a letter from her mother.  As to the latter item, which ALJ Morris did not mention in his decision, the Commissioner has indicated that plaintiff is herself responsible for the oversight; although plaintiff might have intended to submit a letter from her mother, she apparently never did so. Plaintiff replies that the transcript of the hearing proves she proffered her mother's letter, but the first page cited by plaintiff merely mentions two letters that "have not been exhibited" and that ALJ Morris indicated he would review, without identifying their authors, _see_ AR 36, and the other pages cited by plaintiff, which contain a colloquy between plaintiff and her attorney regarding her mother's letter,

(3) whether ALJ Morris appropriately exercised his discretion in refusing to subpoena

Howard Platter, M.D.; (4) whether ALJ Morris gave due weight to the opinion of Angel

Lin, M.D.; (5) whether ALJ Morris gave due weight to the opinion of Linda Jansen,

Ph.D.; and (6) whether ALJ Morris expressed a sufficient basis for discrediting plaintiff's

testimony.  Plaintiff has departed from the traditional manner of challenging a denial of

social security benefits, which usually targets the conclusions reached at one or more of

the five steps in the sequential process for determining whether a claimant is disabled

within the meaning of the Social Security Act.[3]  The Court, however, treats plaintiff's

---

establish only that ALJ Morris did not hear counsel's question, and that plaintiff had read and was upset by the letter, see AR 54-55.  Plaintiff further asserts that the duplication in the administrative record of the first page of her ex-husband's declaration, which appears as both Exhibit 9E, AR 340, and Exhibit 11E, AR 342, demonstrates that her mother's one-page letter is missing, but such observation does not establish that either the ALJ or the Commissioner, as opposed to plaintiff, is at fault for failing to include it.  Plaintiff has not described the contents of her mother's letter or indicated how it might have affected ALJ Morris's analysis, and she has not demonstrated that her mother's missing letter constitutes a basis for remand.

[3] Step one of the sequential evaluation process inquires whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i) & 416.920(a)(4)(i).  If so, the claimant is not entitled to disability benefits, and no further evaluative steps are required.  Id. at §§ 404.1520(b) & 416.920(b); see also id. at § 404.1572 (defining "substantial gainful activity" as "significant physical or mental activities" done or usually done for "pay or profit").  Step two asks whether the claimant has a severe impairment, or a combination of impairments, that significantly limits the claimant's physical or mental ability to do basic work activities.  See id. at §§ 404.1520(a)(4)(ii)&(c) and 416.920(a)(4)(ii)&(c).  If not, the claimant is not entitled to disability benefits, and again, additional analysis is not required.  Id.  Step three involves a determination of whether any of the claimant's severe impairments is equivalent to one that is listed in the regulations.  Id. at §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii).  A claimant with an impairment that "meets or equals" a listed impairment for the requisite twelve-month duration is "per se" disabled and qualifies for benefits.  See id. at §§ 404.1520(d) & 416.920(d).  If the claimant is not "per se" disabled, then the question under step four is whether the claimant's "residual functional capacity" enables the claimant to perform past relevant work.  Id. at §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv).  If the claimant can still perform past relevant work, then the claimant is not entitled to disability benefits and the inquiry ends there.  Id. at §§ 404.1520(e)-(f) & 416.920(e)-(f).  On the other hand, if the opposite conclusion is reached, the burden shifts to the Commissioner at step five to prove that the claimant can make an adjustment to other work, taking into account the claimant's age, education, and work experience.  Id. at §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v); see id. at §§ 404.1560(c)(2) & 416.960(c)(2).  If the claimant cannot make such adjustment to other work, disability benefits may be awarded.  Id. at §§ 404.1520(g) & 416.920(g).

1   arguments, which primarily involve the assessment of her residual functional capacity, as

2   challenging ALJ Morris's findings at steps four and five of the sequential evaluation

3   process.  Plaintiff does not appear to separately attack ALJ Morris's determination, at

4   step three, that she is not "per se" disabled, or the vocational expert's estimates, at step

5   five, concerning the number of jobs available for persons with the residual functional

6   capacities described in the various hypotheticals posed by ALJ Morris.

7   **Discussion**

8          This Court's review is limited to assessing whether the ultimate denial of benefits

9   is free of legal error and based on factual findings that are supported by substantial

10  evidence.  _See_ _Tidwell v. Apfel_, 161 F.3d 599, 601 (9th Cir. 1998); _see also_ 42 U.S.C.

11  § 405(g).  Substantial evidence means "more than a mere scintilla, but less than a

12  preponderance" of evidence; it is "such relevant evidence as a reasonable person might

13  accept as adequate to support a conclusion."  _Lingenfelter v. Astrue_, 504 F.3d 1028, 1035

14  (9th Cir. 2007).  In determining whether the factual findings are supported by substantial

15  evidence, the Court must "review the administrative record as a whole, weighing both

16  the evidence that supports and the evidence that detracts from the Commissioner's

17  conclusion."  _Reddick v. Chater_, 157 F.3d 715, 720 (9th Cir. 1998).  The Court "may not

18  affirm simply by isolating a specific quantum of supporting evidence."  _Jones v. Heckler_,

19  760 F.2d 993, 995 (9th Cir. 1985).  If, however, the evidence reasonably supports both

20  affirming and reversing the denial of benefits, the Court may not substitute its judgment

21  for that of the ALJ.  _See_ _Reddick_, 157 F.3d at 720-21; _see also_ _Thomas v. Barnhart_, 278

22  F.3d 947, 954 (9th Cir. 2002) (if "the evidence is susceptible to more than one rational

23

ORDER - 4

1    interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

2    upheld").

3    **A.**      **Administrative Record**

4           Ordinarily, the administrative record for a matter brought before the Court under

5    42 U.S.C. §§ 405(g) and/or 1383(c) contains materials pertaining only to the individual

6    seeking judicial review.  *See* 20 C.F.R. § 405.360 ("The official record will include the

7    applications, written statements, certificates, reports, affidavits, medical records, and

8    other documents that were *used in making the decision under review* . . . .  The official

9    record of *your claim* will contain all of the marked exhibits and a verbatim recording of

10   all testimony offered at the hearing; it also will include any prior initial determinations or

11   decisions on *your claim*." (emphasis added)); *see also* *id.* at § 404.1512 ("Evidence is

12   anything you or anyone else submits to us or that we obtain that relates to *your claim*."

13   (emphasis added)).  In this case, however, plaintiff contends that the administrative

14   record should include redacted copies of 49 decisions issued by ALJ Morris between

15   September 27, 2012, and July 15, 2013, concerning other applicants for DIB and/or SSI

16   benefits, as well as copies of psychological or psychiatric evaluations performed in

17   twelve of those cases.  *See* Compl. at ¶ 3.1 (docket no. 1).[4]

18

19   _____

     [4] Plaintiff also asserts that the administrative record should contain letters from Keith Sonnanburg, Ph.D.,

20   and James Czysz, Ph.D., which were attached to plaintiff's counsel's letter dated September 20, 2013,
     addressed to ALJ Morris and Chief ALJ David DeLaittre.  *See* Compl. at ¶ 3.1 (docket no. 1); *see also*

21   AR 262, 268-69, 272-74 (citing Sonnanburg's letter as Exhibit 8 to counsel's letter); AR 270, 276-77
     (citing Czysz's letter as Exhibit 13 to counsel's letter).  Plaintiff's counsel quoted extensively from

22   Sonnanburg's and Czysz's letters in his own letter to ALJ Morris and Chief ALJ DeLaittre, which is
     already part of the administrative record, and thus, the substance of those documents is before the Court.

23   Plaintiff makes no assertion that Sonnanburg's and/or Czysz's letters contain relevant information beyond

     ORDER - 5

Plaintiff's position is without merit. ALJ Morris's rulings, and psychological or psychiatric evaluations, about claimants other than plaintiff may not be used to make a determination concerning whether plaintiff is disabled within the meaning of the Social Security Act, and thus, such rulings and evaluations do not constitute "evidence," as defined by regulation, and are not properly made part of the "official record." *See* 20 C.F.R. §§ 404.1512 & 405.360; *see also* Hearings, Appeals, and Litigation Law Manual [HALLEX] I-3-9-40(E) (available at https://www.ssa.gov/OP_Home/hallex/hallex.html) (enumerating as an example of "error on the face of the evidence" an adjudicator's reliance on "the wrong person's" records). Moreover, a non-random[5] assortment of prior decisions by ALJ Morris does not establish bias or a reason requiring him to recuse. Plaintiff does not suggest that all (or even any) of the 49 decisions at issue were reversed or otherwise called into question upon administrative or judicial review.[6] Rather, plaintiff advances three arguments for how this small sample of decisions allegedly

---

the lengthy passages reproduced from them in counsel's letter to ALJ Morris and Chief ALJ DeLaittre, and thus, she has not established that a remand is necessary for the purpose of incorporating those letters into the administrative record.

[5] The 49 decisions at issue involve claimants represented by a small number of law firms, including Schroeter, Goldmark & Bender. None of the decisions involve claimants who appeared pro se. Plaintiff has not described how the demographics of claimants represented by the law firms in question compare with the demographics of claimants concerning whom ALJ Morris issued decisions during the time period at issue, has not identified the other law firms involved, and has not indicated what portion of the 49 decisions concern clients of Schroeter, Goldmark & Bender; her attorney has merely stated that, to the best of his knowledge, the 49 decisions at issue represent all rulings by ALJ Morris received by the law firms in question during the described time period. AR 252.

[6] Plaintiff apparently submitted to ALJ Morris and Chief ALJ David DeLaittre declarations from attorneys Ann Cook, Anne Kysar, Peter McKee, Matthew Rovner, and Sandra Widlan. *See* AR 252. Whether these declarations discuss the results of any administrative or judicial review in the 49 cases in question is unknown. Moreover, in neither her pleading nor her opening brief does plaintiff make any allegation or argument that such declarations should have been incorporated into the administrative record in this case. *See* Compl. at ¶ 3.1 (docket no. 1); Pla.'s Brief (docket no. 10).

ORDER - 6

evidences ALJ Morris's "bias" against "welfare" recipients, routine misapplication of law, and repeatedly improper assessments of claimant credibility,[7] namely:  (i) by representing a lower rate of favorable decisions than the nationwide average; (ii) by revealing different rates of favorable outcomes depending on whether the phrases "Department of Social and Health Services" or "Global Assessment of Functioning" (or their acronyms) appeared in the decision; and (iii) by referring to "welfare" benefits when drawing conclusions about a claimant's motivation to seek employment.  Plaintiff's statistical and substantive analysis is flawed.

## 1. **Comparisons to Peers**

Contrary to plaintiff's assertion, any disparity between ALJ Morris's and his colleagues' statistics does not itself demonstrate "bias."  With respect to the 49 decisions issued by ALJ Morris between September 27, 2012, and July 15, 2013, concerning claimants represented by certain law firms, including Schroeter, Goldmark, & Bender, 13 (26.5%) were favorable.  This rate is consistent with (and indeed higher than) the percentage of favorable decisions (20%) that were issued by ALJ Morris during roughly the same timeframe, without regard to legal representation.  _See_ AR 251 (stating that 44 of 220 decisions between September 29, 2012, and June 28, 2013, were favorable).

---

[7] Plaintiff does not explain how the Court could possibly review ALJ Morris's legal analysis and/or credibility findings in other cases without access to the administrative record in each proceeding, which plaintiff has never proffered, or how the Court's consideration of such collateral challenges to decisions involving other claimants would be in any way consistent with either the provisions or purposes of the Social Security Act.  _See_ 42 U.S.C. § 405(h) ("No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided."); _see also_ _Heckler v. Ringer_, 466 U.S. 602, 614-15 (1984) (Section 405(h) "provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue of judicial review"); _Weinberger v. Salfi_, 422 U.S. 749, 760-64 (1975).

ORDER - 7

1   Both of the above-recited rates, however, are substantially less than the median rate of

2   favorable decisions for the 1,336 ALJs across the country who each issued more than

3   200 rulings during the period at issue, which was roughly 55%.  AR 252.  Plaintiff's

4   contention that ALJ Morris's below-median rate of favorable decisions somehow shows

5   "bias" ignores the fact that ALJs hear a matter only after benefits have already been

6   denied on initial determination and after reconsideration.  _See_ 20 C.F.R. §§ 404.900(a) &

7   416.1400(a).  ALJ Morris's lower rate of favorable decisions (or reversals) might simply

8   reflect that determinations made initially and/or on reconsideration in this region are of

9   higher quality than elsewhere in the nation, and thus, does not itself substantiate any

10  parsimony or "bias" on the part of ALJ Morris.

11          2.      **Comparisons Among 49 Prior Decisions**

12          Plaintiff's attempt to correlate certain terms with particular results among the 49

13  decisions at issue is premised on improper assumptions.  Plaintiff focuses on 34 of the 49

14  previous decisions by ALJ Morris in which the agency name "Department of Social and

15  Health Services" and/or the acronym "DSHS" appears.  _See_ AR 255.  Plaintiff casts

16  aspersions against ALJ Morris because he issued favorable decisions in only five of the

17  34 decisions mentioning DSHS, or in roughly 15% of them.  _Id._  Plaintiff contrasts this

18  figure with the rate of favorable outcomes (53%) among the remaining 15 decisions,[8]

19  eight of which were favorable.  _Id._  Plaintiff, however, makes no representation

20  _____

21  [8] Plaintiff's counsel's letter dated September 20, 2013, to ALJ Morris and Chief ALJ DeLaittre, indicates
    that eight of the "remaining 16 decisions" were favorable.  AR 255.  The Court will assume that the letter

22  correctly reported the number of favorable rulings, but miscalculated the difference between 49 and 34.

23

1  concerning whether the claimants in those other 15 cases were receiving DSHS benefits

2  even though ALJ Morris's decision did not specifically refer to DSHS, and the Court

3  declines to draw from the mere absence of the agency name or its acronym the inferences

4  suggested by plaintiff, namely that the other 15 cases involved claimants who were not

5  poor and/or not receiving benefits from DSHS.

6      With regard to Global Assessment of Functioning ("GAF"),[9] the Court reaches a

7  similar conclusion.  According to plaintiff, of the 49 prior decisions at issue, 17 involved

8  claimants who had sought or received DSHS benefits and submitted evidence of a GAF

9  score.  *See* Pla.'s Brief at 9 (docket no. 10 at 14).  Plaintiff criticizes ALJ Morris because,

10 of those 17 decisions, only one was favorable (6%), while of the other 32 decisions,

11 twelve were favorable (38%).  *Id.*  Plaintiff does not, however, indicate whether the

12 claimants in the twelve other favorable decisions received DSHS benefits or had GAF

13 evaluations, regardless of whether ALJ Morris explicitly discussed them.[10]

14 _____

15 [9] Global Assessment of Functioning, which had been Axis V in a multi-axial system for assessing mental
   disorders, is no longer in widespread use.  *See* Am. Psychiatric Ass'n, DIAGNOSTIC & STATISTICAL

16 MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013) ["DSM-5"].  The GAF scale had ranged from 0 to
   100, with each 10-point increment having both a symptom severity and a functioning component; a

17 GAF rating would fall within particular decile (*e.g.*, 1-10, 11-20, etc.) if either the symptom severity or
   the level of functioning met the criteria.  Am. Psychiatric Ass'n, DIAGNOSTIC & STATISTICAL MANUAL

18 OF MENTAL DISORDERS 32 (4th ed. (Text Revision) 2000) ["DSM-IV-TR"]; *see id.* at 33 (indicating that,
   when an "individual's symptom severity and level of functioning [were] discordant, the final GAF rating

19 always reflect[ed] the worse of the two").  The GAF methodology was considered "useful in tracking the
   clinical progress of individuals in global terms, using a single measure" with respect to "psychological,
   social, and occupational functioning," but not as to physical impairments or environmental limitations.

20 *Id.* at 32.  The DSM-5 has moved away from the axial diagnosis method and discarded the GAF scale
   because of "its conceptual lack of clarity" and "questionable psychometrics in routine practice."  DSM-5
21 at 16.

22 [10] Plaintiff has separately stated that five of ALJ Morris's thirteen favorable decisions during the period at
   issue referred to DSHS.  Thus, of the twelve comparator decisions, four must have mentioned DSHS, and
   whether other favorable decisions involved claimants receiving DSHS benefits is unknown.  In a different

23

Plaintiff simply has not provided sufficient information from which to insinuate, on the basis of outcome ratios, hostility on the part of ALJ Morris toward applicants for, or recipients of, DSHS benefits and/or persons measured on the now-obsolete GAF scale. In addition, given the small sample sizes at issue (*i.e.*, 5 of 34 versus 8 of 15, and 1 of 17 versus 12 of 32), the variations plaintiff has calculated in the rates of ALJ Morris's favorable decisions are not statistically significant.  Moreover, plaintiff's argument that the 49 prior decisions would, if added to the administrative record in this case, demonstrate "bias" against her on the basis of "DSHS/GAF" status is meritless given that plaintiff does not even allege that ALJ Morris improperly used or ignored her GAF score.[11]  *See id.* at 7 & 9 (docket no. 10 at 12 & 14).

### 3.   References to "Welfare"

Plaintiff challenges specific language contained in three of the 49 prior decisions. Two of the three decisions issued by ALJ Morris included a finding, based in part on the receipt of "food stamps," that the claimant might lack "motivation and a sense of urgency to find work."  *See* AR 256 (quoting Decisions Nos. 7 and 17).  The other decision at issue had similar language, but was based in part on the claimant's receipt of General

---

context, plaintiff represented that, in "more than 20" of the 49 decisions at issue, GAF measurements were used.  Pla.'s Brief at 7 (docket no. 10 at 12).  Thus, in addition to the 17 decisions relating to persons that plaintiff describes as "DSHS/GAF" claimants, at least three other decisions discussed GAF scores. Plaintiff has not indicated whether these three (or more) cases in which GAF figures were mentioned had favorable or unfavorable outcomes.

[11] An examining psychologist graded plaintiff as a 55 on the GAF scale, *see* AR 433, which was within the range reserved for "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)," DSM-IV-TR at 34 (emphasis in original).  ALJ Morris's decision does not mention plaintiff's GAF score or its ramifications.

ORDER - 10

1   Assistance – Unemployable ("GAU") benefits.  _See_ AR 256-57 (quoting Decision No. 4).

2   In reproaching ALJ Morris for improperly drawing inferences from the receipt of food

3   stamps or GAU benefits, plaintiff reasons that "welfare" is provided only to poor

4   individuals who are determined by DSHS to be "disabled," and that the inability of an

5   individual to work, as a result of a "disability," cannot logically support the conclusion

6   that the person lacks motivation to find employment.

7          Plaintiff relies on a false premise.  Many DSHS or "welfare" benefits are available

8   to individuals who are poor, but who are not "disabled."  _See_ WAC Chapter 388-400

9   (summarizing assistance programs).  For example, Washington's Basic Food program

10  subsidies (_i.e._, "food stamps") can be obtained by those who satisfy citizenship or alien

11  status, residency, income, and work requirements.  WAC 388-400-0040.  Disability is not

12  among the eligibility criteria for food stamps, but disability can serve as a basis for an

13  exemption from the income and work requirements.  _Id._; _see_ WAC 388-444-0010(7).

14  Other grounds for exemption from work requirements include enrollment in an accredited

15  school, training program, or institution of higher education, caring for a dependent child

16  under the age of six or for an incapacitated adult, and regular participation in a drug

17  addiction or alcoholic treatment and rehabilitation program.  WAC 388-444-0010(2), (6),

18  & (8).  Thus, the receipt of food stamps is not necessarily tied to the presence of a

19  "disability."

20         In addition, under the GAU program, which was in effect until 2010, an individual

21  could receive benefits if he or she was merely "incapacitated," meaning he or she could

22  not be gainfully employed as a result of a physical or mental impairment that was

23

ORDER - 11

1    expected to continue for only 90 or more days (as opposed to the twelve or more months

2    required under the Social Security Act to establish "disability").  _See_ WAC 388-448-0001

3    (2009).[12]  GAU benefits could continue, even when SSI benefits were never sought, if

4    the recipient demonstrated "no material improvement" in his or her "medical or mental

5    condition."  _See_ RCW 74.04.005(6)(g) (2009).[13]  Thus, plaintiff's argument depends on a

6    fallacy, namely that all "welfare" recipients are "disabled," and she therefore fails to

7    establish that the correlation between the receipt of either food stamps or GAU benefits

8    and a lack of motivation to seek work, which was drawn by ALJ Morris, constitutes

9    evidence of "bias."  More importantly, because ALJ Morris did not, in plaintiff's case,

10   render any findings concerning possible disincentives for plaintiff to obtain employment,

11   plaintiff has not shown that any such alleged "bias" played a role in the denial of benefits

12   at issue here.

13        **4.    Plaintiff's Citations Are Inapposite**

14        Plaintiff's reliance on _Varney v. Sec'y of Health & Human Servs._, 846 F.2d 581,

15   _modified by_ 859 F.2d 1396 (9th Cir. 1988), as support for her request to augment the

16   _____

17   [12] In contrast, to qualify under the current system for the DSHS benefit known as aged, blind, or disabled

18   ("ABD") cash assistance, a person must be (i) 65 years of age or older, (ii) blind, or (iii) "likely to be
     disabled."  WAC 388-400-0060(1)(a).  For purposes of the ABD program, the term "disabled" or
     "disability" has essentially the same meaning as under the Social Security Act, namely "the inability to

19   engage in any substantial gainful activity" because of a "medically determinable physical or mental
     impairment" that can be expected to result in death or to last for a continuous period of at least twelve

20   months.  WAC 388-449-0001(1)(c); _compare_ 42 U.S.C. §§ 416(i)(1) & 1382c(a)(3).

21   [13] The ABD program, now in effect, terminates cash assistance after a final decision (favorable or not)
     is made concerning SSI benefits, _see_ RCW 74.62.030(1)(b); WAC 388-449-0150(3), and its immediate
     predecessor, Disability Lifeline, imposed a cap on the length of time (24 months in a 60-month period) an

22   individual could receive benefits, _see_ RCW 74.04.005(5)(h) (2010); _see also Elkins v. Dreyfus_, 2010 WL
     3947499 at *1-*2 (W.D. Wash. Oct. 6, 2010) (summarizing the statutory scheme).

23

1  administrative record, is misplaced.  Plaintiff asserts that she has met both of _Varney_'s

2  "alternative tests" for remand.  Pla.'s Brief at 4 (docket no. 10).  _Varney_, however, did

3  not adopt any test.  In _Varney_, the social security claimant sought remand because the

4  first 260 units of the tape recording of her hearing could not be transcribed and another

5  26 passages in the transcript were marked "inaudible."  846 F.2d at 583.  The district

6  court denied the claimant's request for remand because she had failed to make a showing

7  that "material evidence was missing from the record."  _Id._; _see also_ _McGlone v Heckler_,

8  791 F.2d 1119, 1120 (4th Cir. 1986) ("Whether the transcript is inadequate depends upon

9  the materiality of the omissions.  The plaintiff shoulders the burden of showing that some

10  material evidence was not reported or was so incompletely reported that its effect is

11  obscured.").  On appeal, the claimant argued that the standard applied by the district

12  court, which came from _McGlone_, improperly placed on the claimant the burden of

13  producing a complete record, and she asserted that the appropriate test is "whether the

14  record is adequate to allow judicial review."  846 F.2d at 583 (citing _Ward v. Heckler_,

15  786 F.2d 844, 848 (8th Cir. 1986) (indicating that, "[a]lthough distracting, the gaps [in

16  the transcript] did not interfere with comprehension of the testimony to an extent that

17  would hinder fair review")).  The Ninth Circuit did "not decide which of these two

18  standards is the more appropriate because under either one, Varney's argument fail[ed]."

19  _Id._

20      Not only did _Varney_ not adopt or articulate a standard for when remand is needed

21  to shore up the administrative record, _Varney_ also involved a specific component of the

22  administrative record, namely the transcript of the hearing, which is not at issue in this

23

ORDER - 13

1   case.  The district court cases on which plaintiff relies are similarly distinguishable.

2   In each of the district court cases that plaintiff cites, the items missing from the

3   administrative record were either a sufficiently complete transcript of the hearing or an

4   opinion or exhibit relating specifically to the claimant and on which the ALJ relied in

5   making his or her decision.  <u>See</u> <u>Reynolds v. Colvin</u>, 2014 WL 5286865 at *6-*7 (N.D.

6   Ind. Oct. 15, 2014); <u>Parks v. Astrue</u>, 2011 WL 6211003 at *8 (E.D. Cal. Dec. 14, 2011);

7   <u>Hill v. Astrue</u>, 526 F. Supp. 2d 1223, 1230 (D. Kan. 2007); <u>Barnes v. Barnhart</u>, 251 F.

8   Supp. 2d 973 (D. Me. 2003); <u>Bailey v. Heckler</u>, 576 F. Supp. 621 (D.D.C. 1984); <u>Stewart</u>

9   <u>v. Harris</u>, 509 F. Supp. 31, 33-34 (N.D. Cal. 1980).  These authorities do not support

10  plaintiff's contention that the 49 decisions by ALJ Morris and the twelve psychological

11  or psychiatric evaluations at issue should have been incorporated into the administrative

12  record,[14] and plaintiff's motion for remand to add such items to the administrative record

13  is DENIED.

14

15

16

_____

17  [14] In her reply brief, plaintiff discusses an order issued by Magistrate Judge J. Richard Creatura in another
    case being handled by Schroeter, Goldmark & Bender, namely <u>Cope v. Colvin</u>, Case No. C15-1744 JRC.

18  In <u>Cope</u>, which seeks review of ALJ Larry Kennedy's denial of social security benefits, 54 prior decisions
    by ALJ Kennedy were included in the administrative record; the Commissioner's motion to remand the

19  matter to remove the 54 decisions was denied.  Order (C15-1744, docket no. 13).  <u>Cope</u> is not on point.
    A decision denying remand for the purpose of removing items from the administrative record sheds no

20  light on the question of whether a matter should be remanded with the aim of supplementing the record.
    In the order cited by plaintiff, Magistrate Judge Creatura made no ruling concerning whether the 54 prior

21  decisions at issue support the allegation in <u>Cope</u> that ALJ Kennedy is "biased," and if those decisions are
    later deemed irrelevant, Magistrate Judge Creatura may simply ignore them.  As he observed, "[t]he fact

22  that there may be extra information in the record does not preclude this Court from conducting a proper
    review."  <u>Id.</u> at 6.  Because <u>Cope</u> is distinguishable, the Commissioner's motion to strike, docket no. 14,
    portions of plaintiff's reply, or in the alternative to permit a surreply, is STRICKEN as moot.

23

1    **B.**    <u>**Recusal**</u>

2        ALJs are presumed to be unbiased.  <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th

3    Cir. 2001).  This presumption can be rebutted, <u>id.</u> at 857-58, but disqualification of an

4    ALJ requires a showing of "actual bias."  <u>Bunnell v. Barnhart</u>, 336 F.3d 1112, 1114-15

5    (9th Cir. 2003) (holding that the "appearance of impropriety" standard applicable to

6    federal judges, <u>see</u> 28 U.S.C. § 455(a), does not govern ALJs, who are employed by the

7    agency whose actions they review, and who would be required to recuse in every case if

8    "appearance of impropriety" was the measure).  Actual bias exists if an ALJ "is

9    prejudiced or partial with respect to any party or has any interest in the matter pending for

10   decision."  20 C.F.R. §§ 404.940 & 416.1440.  Prejudice is demonstrated if "the ALJ's

11   behavior, in the context of the whole case, was 'so extreme as to display clear inability to

12   render fair judgment,'" but expressions of "impatience, dissatisfaction, annoyance, or

13   even anger," which are "within the bounds of what imperfect men and women . . .

14   sometimes display," do not themselves establish bias.  <u>Rollins</u>, 261 F.3d at 858 (quoting

15   <u>Liteky v. United States</u>, 510 U.S. 540, 551, 555-56 (1994)).

16       Plaintiff contends that ALJ Morris should have recused, but she points to no

17   instances in which ALJ Morris manifested a lack of impartiality.  Indeed, the transcript of

18   the hearing reveals that ALJ Morris did not utter even a harsh word, and it contains no

19   evidence of bias.  In his decision, ALJ Morris indicated that he did not have a personal

20   interest in this matter, was not acquainted with plaintiff, did not know anyone in common

21   with her, and did not learn about her from an extrajudicial source.  AR 16.  Plaintiff does

22   not dispute the accuracy of these representations.

23

Instead, plaintiff asserts that ALJ Morris misinterpreted Section I-2-1-60 of the Hearings, Appeals, and Litigation Law Manual.  This provision recites concrete examples of proper grounds for recusal, including situations in which an ALJ and a claimant are acquainted with the same third person or an ALJ has knowledge about a claimant from an extrajudicial source.  The provision also indicates that an ALJ may withdraw from a case if the "ALJ believes his or her participation in the case would give an appearance of impropriety."  HALLEX I-2-1-60(A).  Plaintiff assigns error to ALJ Morris's exclusive focus on the specific criteria for recusal and his silence regarding the more general "appearance of impropriety" basis for disqualification.  Plaintiff does not, however, explain why ALJ Morris was required to discuss the "appearance of impropriety" test when the Ninth Circuit has indicated that it does not apply.  _See_ _Bunnell_, 336 F.3d at 1114-15.  Moreover, plaintiff's argument that ALJ Morris was required to recuse on "appearance of impropriety" grounds lacks merit for the same reason that her motion for remand to expand the administrative record was denied.  Plaintiff's request that ALJ Morris's decision be reversed on the basis of disqualification is DENIED.

**C.     Subpoena**

Plaintiff assigns error to ALJ Morris's refusal to subpoena Howard Platter, M.D., a non-examining medical consultant for the Division of Disability Determination Services ("DDS"), a state agency that, pursuant to federal regulations, makes initial assessments concerning eligibility for DIB and SSI benefits and processes reconsideration requests.  Dr. Platter became involved with plaintiff's case when she, without legal representation, sought reconsideration of the initial denial of benefits.  _See_ AR 98-107 (Ex. 7A) & 108-

20 (Ex. 8A).  In conjunction with DDS examiner Jeffrey Petruso, Dr. Platter concluded, based on the medical evidence in the record, that plaintiff had the residual functional capacity to lift and/or carry 20 pounds occasionally (meaning "cumulatively 1/3 or less of an 8-hour day") and 10 pounds frequently (meaning "cumulatively more than 1/3 [and] up to 2/3 of an 8-hour day"), to stand about six hours in an 8-hour workday, and to sit about six hours in an 8-hour workday.  AR 104, 114-15; _see_ 20 C.F.R. §§ 404.1527(e) & 416.927(e) (outlining the procedures applicable when a state agency examiner makes an initial or reconsideration determination alone or in conjunction with a state agency medical or psychological consultant).

Although ALJ Morris was required to consider Dr. Platter's views, he was not bound by them.  20 C.F.R. §§ 404.1527(e)(2)(i) & 416.927(e)(2)(i).  ALJ Morris assigned "some evidentiary weight" to Dr. Platter's assessment because it was "largely consistent with the claimant's longitudinal treatment history and performance on physical examinations," AR 24, but he added more restrictions in light of (i) plaintiff's right wrist de Quervain's tenosynovitis, which was diagnosed after Dr. Platter issued his opinion, _see_ AR 21 (finding that plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently with her _left_ hand, but only "docket files, ledgers, and small tools" with her _right_ hand), and (ii) plaintiff's complaints of pain and the views of her treatment provider, _see id._ at 21 & 24 (concluding that plaintiff could stand or walk for only four hours, rather than six hours, in an 8-hour workday).  Plaintiff has not quarreled with ALJ Morris's adjustment concerning the amount of time she can stand or walk each day,

1   or with the assessments of ALJ Morris and Dr. Platter (as well as the DDS examiner)

2   regarding her ability to sit for six hours in an 8-hour shift.

3          Plaintiff's assertion that ALJ Morris should have subpoenaed Dr. Platter relates

4   solely to the quantum of weight she was deemed capable of lifting or carrying with her

5   left hand.  Plaintiff argues that ALJ Morris's conclusion she can lift or carry 20 pounds

6   occasionally and 10 pounds frequently with her left hand, which would be consistent with

7   the physical exertion requirements for "light work," _see_ 20 C.F.R. §§ 404.1567(b) &

8   416.967(b), is contradicted by her treatment provider's evaluation concerning her lifting

9   and carrying strength, _see_ AR 441-42 (Ex. 10F).  Plaintiff does not, however, challenge

10  ALJ Morris's conclusion that she can lift and carry "docket files, ledgers, and small

11  tools," which meets the lifting and carrying criteria for "sedentary work."  _See_ 20 C.F.R.

12  §§ 404.1567(a) & 416.967(a).  Because ALJ Morris based his decision that plaintiff can

13  make an adjustment to other work on the number of "sedentary," as opposed to "light

14  work," jobs available in the national economy for someone of her age, education, work

15  experience, and residual functional capacity, _see_ AR 26, plaintiff fails to show that any

16  error in not subpoenaing Dr. Platter was prejudicial.

17         In addition, plaintiff has not demonstrated that she was entitled to have Dr. Platter

18  subpoenaed.  When "necessary for the full presentation of a case," an ALJ may either

19  sua sponte or at the request of a party issue subpoenas for the appearance and testimony

20  of witnesses and/or the production of documents.  20 C.F.R. §§ 404.950(d)(1) &

21  416.1450(d)(1).  An ALJ has discretion to decide when a subpoena and related cross-

22  examination is warranted.  _Solis v. Schweiker_, 719 F.2d 301, 302 (9th Cir. 1983); _see_

23

Tarter v. Astrue, 2012 WL 1631968 at *3 (W.D. Wash. Apr. 17, 2012) (report and

recommendation to reverse and remand), adopted 2012 WL 1631887 (W.D. Wash.

May 9, 2012).  An ALJ abuses such discretion, and violates the claimant's procedural

due process rights, if he or she does not subpoena or permit cross-examination of an

examining physician who is a "crucial witness" and "whose findings substantially

contradict the other medical testimony."  Solis, 719 F.2d at 301.  ALJ Morris did not

abuse his discretion or violate plaintiff's procedural due process rights in refusing to

subpoena Dr. Platter.

Dr. Platter was not a "crucial witness."  He neither treated nor examined plaintiff.

He merely reviewed the medical evidence in the record and formulated opinions that

ALJ Morris could and did (in part) disregard.  See 20 C.F.R. §§ 404.1527(e)(2) &

416.927(e)(2).  Cross-examination of Dr. Platter would have produced no evidence

concerning plaintiff's lifting and carrying abilities, and would have instead focused

primarily on a form completed by plaintiff's treating physician, which ALJ Morris could

(and did) himself interpret.  The form, which was signed in April 2011 by Angel Lin,

M.D., indicated that plaintiff's impairment was expected to last three months or "possibly

longer," that plaintiff could lift "0-5 pounds" occasionally and frequently, and that she

had "some weakness in ® arm," making her "unable to lift more than 5 lbs."  AR 441-42

(Ex. 10F).

Dr. Platter's findings did not "substantially contradict" the form in question or the

other medical testimony.  Dr. Platter reached his conclusions in late October 2012,

AR 105 & 116, over a year after the period during which Dr. Lin predicted plaintiff's

right arm weakness would persist.  Although the April 2011 form offers no explanation, the office visit notes from approximately the same timeframe indicate that plaintiff was complaining of right shoulder pain, _see_ AR 407-11, as opposed to the symptoms of de Quervain's tenosynovitis, which was not diagnosed in her left wrist until early 2012, AR 386-89, and which did not develop in her right wrist until 2013, _see_ AR 455-56, 458-60.  In July and again in September 2011, Dr. Lin referred plaintiff to physical therapy to address lower back and neck pain and tingling in her left hand and foot. AR 401-03; _see_ AR 390-92.  No further mention was made of right shoulder pain or right arm weakness, and Dr. Platter could have reasonably inferred that the issue had resolved as anticipated within the three-month period between April and July 2011.

Plaintiff commenced physical therapy in October 2011, but in November 2011, she telephonically requested to cancel future appointments and be discharged from physical therapy.  AR 361-68.  As a result, plaintiff's physical therapist issued a discharge report; according to the report, at the end of the last physical therapy session in late October 2011, plaintiff "reported no pain or tingling in [her] fingers" and demonstrated an increased range of motion in her shoulders and thoracic spine.  AR 362. This evidence does not "substantially contradict," but rather supports, Dr. Platter's estimate that plaintiff can lift and carry the amount of weight associated with "light work."  Plaintiff's argument that she was not afforded procedural due process because Dr. Platter was not subpoenaed lacks merit.

1    **D.**    **Dr. Lin's Opinion**

2         For similar reasons, plaintiff cannot prevail on her assertion that ALJ Morris gave

3    insufficient weight to the form Dr. Lin completed in April 2011.  With regard to lifting

4    and carrying restrictions, ALJ Morris discounted Dr. Lin's opinion only with respect to

5    plaintiff's left upper extremity; he did so in light of medical evidence, _see_ AR 455, and

6    plaintiff's testimony, _see_ AR 52, that the de Quervain's tenosynovitis on her left side had

7    resolved.  AR 24.  The Court is satisfied that Dr. Lin's assessment concerning plaintiff's

8    lifting and carrying strength had expired on its own terms and was contradicted by more

9    recent evidence, and that ALJ Morris articulated "specific and legitimate reasons" based

10   on "substantial evidence in the record" for disregarding in part the April 2011 form.  _See_

11   _Lester v. Chater_, 81 F.3d 821, 830 (9th Cir. 1995).

12        The Court is also persuaded that, even if ALJ Morris misjudged how much

13   plaintiff can lift and carry with her left hand, such overestimate is harmless because

14   ALJ Morris considered only "sedentary" occupations in his step five analysis.  _See_

15   AR 26.  As he observed, if plaintiff had the residual functional capacity "to perform the

16   full range of light work, a finding of 'not disabled' would be directed by Medical-

17   Vocational Rule 202.21," but plaintiff's "ability to perform all or substantially all of the

18   requirements of this level of work has been impeded by additional limitations."  _Id._

19   Accordingly, ALJ Morris tailored the questions he posed to the vocational expert.  _See_

20   AR 64-66 (framing hypotheticals that included, alternatively, sedentary-level lift-and-

21   carry restrictions for the right hand, and reduced "light work" lift-and-carry limits of ten

22   pounds occasionally and five pounds frequently).  In response to plaintiff's counsel's

23

1   inquiry, the vocational expert explained that the "sedentary" jobs he had identified in his

2   answers to ALJ Morris would also fit a situation in which an individual could lift and

3   carry only five pounds or less.  AR 72.  ALJ Morris's treatment of Dr. Lin's April 2011

4   opinion is simply not a ground for reversal.

5   **E.   Dr. Jansen's Opinion**

6          Plaintiff was examined in mid-October 2012 by Linda Jansen, Ph.D., a consulting

7   psychologist for DDS, after failing to appear on three prior occasions.  *See* AR 423, 428,

8   & 429 (Exs. 4F, 6F, & 7F).  Dr. Jansen observed that plaintiff (i) had "fair" eye contact,

9   (ii) had a generally normal rate and volume of speech, although at times she spoke

10  rapidly, (iii) exhibited a "generally linear" stream of mental activity, (iv) was able to

11  follow the conversation, although her answers were often indirect and her responses

12  sometimes rambling and repetitive, (v) was alert and oriented to person, place, and time,

13  although she was unsure of the exact date, (vi) properly identified the current season as

14  "fall" and correctly named the current and previous presidents, as well as the current

15  governor, (vii) registered three of three objects and recalled them four minutes later,

16  (viii) correctly spelled the word "world" backwards and accurately subtracted serial 7s,

17  (ix) followed a simple three-step command, and (x) performed in the average range for

18  her age on Trail Making tasks.  AR 430-31.  According to Dr. Jansen, plaintiff's

19  performance on the Trail Making tasks, one of which required "making cognitive shifts"

20  or "being mentally flexible," suggested that plaintiff "has little difficulty with attention

21  and concentration."  AR 431.

22

23

ORDER - 22

1    Dr. Jansen described plaintiff's prognosis as "guarded."  AR 433.  Relying on

2 plaintiff's complaints of chronic pain (historically managed with narcotics), homelessness

3 (forcing her to stay with her ex-husband), and symptoms of depression and anxiety

4 (*i.e.*, lack of energy, loss of sleep and appetite, anhedonia, restlessness, irritability, poor

5 concentration, self-isolation, rumination, perseveration, and hopelessness), Dr. Jansen

6 concluded that plaintiff "would have difficulty performing complex work tasks," that

7 plaintiff's tendency to isolate herself "would interfere with [her] ability to work with the

8 public or with co-workers on a continual basis," that plaintiff "would be unable to cope

9 with the usual stress encountered in a competitive work setting," and that plaintiff's

10 "chances for a return to employment are not likely to improve without improvement in

11 pain management."  AR 432-34.

12    In his description of plaintiff's residual functional capacity, ALJ Morris included

13 some of the limitations outlined by Dr. Jansen.  ALJ Morris concluded that plaintiff

14 "must avoid public contact," but could have "frequent contact with five or fewer

15 coworkers."  AR 21.  He further indicated that plaintiff can "understand and remember

16 short simple instructions," as opposed to complex ones, and can "perform tasks with an

17 emphasis on objects and things rather than people."  *Id.*  ALJ Morris, however, assigned

18 "little weight," AR 24, to Dr. Jansen's opinion that depression and pain "contribute to

19 difficulty with attention, concentration, and cognitive flexibility, which would interfere

20 with [plaintiff's] ability to persist through a normal work day or to respond appropriately

21 to changes in the workplace," AR 433  As a result, ALJ Morris assessed plaintiff as

22 having the residual functional capacity to tolerate "occasional changes in the work

23

ORDER - 23

1   environment."  AR 21.  ALJ Morris also discounted Dr. Jansen's prediction that plaintiff

2   would be unable to cope with typical work stresses and would be unlikely to return to

3   employment without better pain management.  AR 24.

4        Plaintiff asserts that ALJ Morris erred in disregarding in part Dr. Jansen's opinion.

5   The Court disagrees.  As indicated by ALJ Morris, the record reveals "very little if any

6   treatment" for mental health issues.  _See_ AR 23.  In September 2011, plaintiff was seen

7   by a naturopathic doctor, Jo Ann M. Dechant, ND, for menopausal symptoms, which

8   included mood swings, "crying over nothing," being easily irritated, and experiencing

9   anxiety shortly before menses.  AR 393-95.  At that time, Dr. Dechant observed "[n]o

10  unusual anxiety or evidence of depression."  AR 394.  Although depression was

11  mentioned in the reports concerning plaintiff's visits to Valley Medical Center ("VMC")

12  in September 2008 and October 2009, plaintiff's chief complaint on each of those

13  occasions was back pain, and neither of the treatment providers involved actually

14  evaluated plaintiff's mental health; they merely noted plaintiff's "history" of depression.

15  AR 357-60.

16        In September 2008, VMC emergency room ("ER") physician James R.

17  Fackelman, M.D. wrote that plaintiff's "mother and sister are getting a prescription

18  for Zoloft, and giving the medicine to her."  AR 359.  Plaintiff apparently told

19  Dr. Fackelman that her "own last personal prescription of Zoloft was '6 to 7 months

20  ago.'"  _Id._  In October 2009, VMC ER physician Danielle C. Schindler, M.D. indicated

21  that plaintiff "requested a refill on her Celexa as she is currently having trouble finding a

22

23

ORDER - 24

1  primary care physician."  AR 358.[15]  Given Dr. Dechant's assessment in 2011 that

2  plaintiff showed no signs of suffering from depression, and Dr. Fackelman's and

3  Dr. Schindler's notations, which both indicated essentially that plaintiff had not, as of

4  September 2008 and October 2009, been receiving any medical care for depression,

5  Dr. Jansen's opinion concerning the potentially debilitating effects of depression was not

6  "uncontradicted."  Thus, rather than being required to provide "clear and convincing"

7  reasons for rejecting Dr. Jansen's views, ALJ Morris needed to articulate only "specific

8  and legitimate reasons" for doing so, which are supported by "substantial evidence in the

9  record."  *See* *Lester*, 81 F.3d at 830-31.

10      The Court is satisfied, however, that ALJ Morris met both standards.  ALJ Morris

11  aptly observed that Dr. Jansen's opinion was internally inconsistent.  Dr. Jansen's

12  findings that plaintiff tested within the average range for her age on Trail Making tasks

13  and exhibited little difficulty with attention and concentration cannot be reconciled with

14  her conclusion that plaintiff's inability to pay attention and concentrate, as a result of

15  depression and pain, would inhibit her from persisting through a normal work day or

16  responding appropriately to changes in the workplace.  *See* *Bayliss v. Barnhart*, 427 F.3d

17  1211, 1216 (9th Cir. 2005) (holding that a discrepancy between the clinical findings and

18  the opinion of a treating or examining physician constitutes a "clear and convincing"

19  reason for not relying on the opinion).  In addition, as ALJ Morris noted, Dr. Jansen's

20  views about the severity of plaintiff's mental health issues were out of proportion to, and

21

---

22  [15] Dr. Fackelman prescribed a one-month supply of the antidepressant Zoloft, AR 359, but Dr. Schindler appears to have declined plaintiff's refill request as to the antidepressant Celexa, *see* AR 357-58.

23

ORDER - 25

actually contraindicated by, the scant evidence concerning any diagnosis of, or treatment for, anxiety or depression.  *See* *Chilcote v. Astrue*, 2013 WL 2033540 at *5 (D. Ore. Apr. 8, 2013) ("Specific, legitimate reasons for disregarding a treating or examining physician's opinion include the absence of regular medical treatment during the alleged period of disability . . . ." (citing *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1464 (9th Cir. 1995); *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989))).

Finally, ALJ Morris appropriately recognized that Dr. Jansen's assessment was based, perhaps in large part, on plaintiff's complaints of pain and an insufficient pain management plan,[16] about which Dr. Jansen, as a psychologist, was not qualified to opine, as she herself acknowledged, *see* AR at 434 ("This examiner defers to the medical provider as to Ms. Yost's physical limitations due to pain . . . .").  *See also* *Jason v. Colvin*, 2015 WL 509804 at *12 (W.D. Wash. Feb. 6, 2015) ("Where a provider renders an opinion that is outside the scope of her treatment expertise and/or specialty, the ALJ does not err in according that opinion little or no weight.").  ALJ Morris gave Dr. Jansen's opinion its proper weight.[17]

---

[16] Plaintiff told Dr. Jansen that "pain interferes with doing most things," but that she had not recently seen her primary care physician about her pain, having taken a "why bother" attitude.  AR 433.

[17] ALJ Morris also suggested that Dr. Jansen's reliance on plaintiff's self-reporting constituted a basis for ascribing "little weight" to her opinion because ALJ Morris found plaintiff "not entirely credible."  *See* AR 25.  Although an ALJ may reject a medical opinion "if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible," *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008), the Court declines to address whether such reason was sound in this case in light of the other three grounds for discounting Dr. Jansen's opinion that were articulated by ALJ Morris, as well as plaintiff's challenge to ALJ Morris's assessment of her credibility.

**F.**   **Plaintiff's Credibility**

ALJ Morris concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that "her statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible" for four reasons:  (i) such statements are inconsistent with plaintiff's "independent daily activities and social interaction," (ii) such statements are not substantiated by medical evidence, (iii) plaintiff appeared to have been engaged in drug-seeking behavior, and (iv) plaintiff misreported her use of substances.  AR 22-24. Plaintiff does not directly challenge these grounds for discounting her credibility, but instead argues that ALJ Morris failed to sufficiently catalog which statements regarding which symptoms he found not credible, citing _Brown-Hunter v. Colvin_, 806 F.3d 487 (9th Cir. 2015).[18]  Plaintiff's reliance on _Brown-Hunter_ is misplaced.

In _Brown-Hunter_, the Ninth Circuit reiterated that, "[t]o ensure that our review of the ALJ's credibility determination is meaningful, and that the claimant's testimony is not rejected arbitrarily, we require the ALJ to specify which testimony she finds not credible, and then [in the absence of a conclusion that the claimant is malingering] provide clear and convincing reasons, supported by the evidence in the record, to support that credibility determination." _Id._ at 489; _see id._ at 492-93.  In _Brown-Hunter_, the ALJ did not specifically identify any inconsistencies between the claimant's testimony and the record; rather, "she simply stated her non-credibility conclusion and then summarized the

---

[18] Plaintiff cited a version of the opinion in _Brown-Hunter_ (798 F.3d 749) that was withdrawn and superseded on denial of rehearing at least two months before she filed her opening brief.

1  medical evidence supporting her [residual functional capacity] determination." _Id._ at

2  494.  ALJ Morris has done so much more.

3      ALJ Morris described in detail plaintiff's various activities of daily living,[19] which

4  he concluded were inconsistent with her assertion that she has disabling functional

5  limitations.  _See_ AR 20-21.  He also highlighted medical evidence from throughout the

6  period of alleged disability indicating that plaintiff exhibited no loss of muscle strength or

7  decrease in her range of motion, was able to ambulate without assistance, experienced

8  complete resolution of the de Quervain's tenosynovitis in her left wrist, was discharged

9  from physical therapy prescribed for back and neck pain at her own request, suggesting

10  that her symptoms are less severe than she alleges, and displayed no signs of unusual

11  anxiety or evidence of depression.  _See_ AR 22-23.[20]  In addition, ALJ Morris referred to

12

13  _____

14  [19] The Court agrees with plaintiff that ALJ Morris's finding about her "taking care of her elderly
grandmother and selling Avon," AR 20, misstates what plaintiff told Dr. Jansen during the psychological
diagnostic interview.  Plaintiff explained to Dr. Jansen that her mother, who generally tended to her
grandmother and sold Avon products, had been admitted to the hospital, and that, as a result, plaintiff had
been delivering Avon products for her mother.  AR 431.  ALJ Morris's misunderstanding is harmless;
although plaintiff was not "selling" Avon products, she was delivering them for her mother, which is
consistent with plaintiff's testimony that she is able to drive, that she sees her mother, who lives about
10-15 minutes away, every other day, that she drives, about once a month, when she gets her food stamps,
to the Fred Meyer near her ex-husband's house in Renton, where she was staying, and that she visits her
sister, who lives in the Northgate area, on occasion, for an entire day at a time, but does not go often
because she "can't afford the gas" and doesn't "want to be driving on the freeway."  AR 54, 56-58, 60-61.

15

16

17

18  [20] As summarized by ALJ Morris, the record reflects that, in September 2008, plaintiff had "normal motor
strength and reflexes"and "no back pain with sitting."  AR 22; _see_ AR 359.  In October 2010, although
plaintiff complained of back pain, "she denied loss of muscle strength or motor control."  AR 22; _see_
AR 355; _see also_ AR 356 ("The patient moves all of her extremities, ambulates without assistance, [and
is] able to ambulate on her heels and toes.  Muscle strength is 5/5 and equal in both upper and lower
extremities.").  In December 2010, plaintiff "moved all extremities with no arm weakness or neurologic
findings."  AR 22; _see_ AR 353.  In April 2011, plaintiff had "4+/5 strength in her right upper extremity
and 5/5 strength in her left upper extremity with full range of motion in her shoulders, elbows, and
hands."  AR 22; _see_ AR 405-06.  In July 2011, plaintiff reported back pain and tingling in her left hand

19

20

21

22

23

ORDER - 28

1    plaintiff's own admissions to treatment providers concerning drug-seeking behavior,[21]

2    AR 23-24, and relied on laboratory results contradicting plaintiff's denial of cocaine use,

3    AR 24.[22]   ALJ Morris provided specific, clear and convincing reasons, supported by

4    medical evidence, for doubting plaintiff's credibility.

5    _____

6    and foot, but the result of a "neurovascular examination was normal with no numbness or weakness."
     AR 22; *see* AR 401-03.  In September 2011, plaintiff's back pain was described as "mild, non-radiating,
7    and stable."  AR 22; *see* AR 390-92.  Plaintiff's brief period of physical therapy was preceded by an
     emergency room visit in October 2011 for shoulder pain, during which the treatment provider "elected not
8    to prescribe narcotics."  AR 22-23; *see* AR 349-50.  After two physical therapy sessions in October 2011,
     plaintiff reported no pain or tingling in her fingers and only slight restriction of joint mobility; she later
9    cancelled all future appointments.  AR 23; *see* AR 362-64.  The de Quervain's tenosynovitis in plaintiff's
     left wrist was diagnosed in February 2012, treated with an injection, and resolved by April 2013, when
10   the same symptoms appeared in plaintiff's right wrist.  *See* AR 23; *see also* AR 386-89, 445-48.  In
     April 2013, plaintiff was treated for a wound in her left armpit, as well as the right wrist de Quervain's
11   tenosynovitis; at that time, her right wrist "had full range of motion without inflammation, erythema,
     warmth, or weakness."  AR 23; *see* AR 445-51.  Although the report from the first of plaintiff's two visits
12   with Dr. Lin in April 2013 mentions a depressive disorder not otherwise specified, the report contains no
     discussion other than an indication that the disorder is considered chronic and that a refill was provided
13   for the antidepressant citalopram (Celexa).  AR 449.  In June 2013, plaintiff told a treatment provider that,
     for a few months, she had been taking 1.5 times the regular dosage of Celexa.  AR 467.  In July 2013,
14   plaintiff reported that she had decreased her intake of Celexa to the prescribed amount of 40 mg per day
     and had not experienced any increased depression.  AR 464; *see* AR 23.  The treatment notes from both
     June and July 2013 indicate that plaintiff exhibited "no unusual anxiety or evidence of depression."  *See*
15   AR 23; *see also* AR 465, 469.

16   [21] In addition to plaintiff's admission to Dr. Fackelman that she was taking Zoloft prescribed to her
     mother and sister, AR 359, ALJ Morris cited plaintiff's statement to Dr. Lin in September 2010 that she
17   had self-medicated with her mother's Vicodin and her sister's Xanax.  *See* AR 23-24; *see also* AR 412.
     In addition, ALJ Morris referenced plaintiff's failed attempt in January 2011 to obtain a new prescription
     for Percocet and an injection of Toradol (ketorolac tromethamine), a nonsteroidal anti-inflammatory drug
18   ("NSAID").  AR 24; *see* AR 407-08.  In January 2011, plaintiff told a nurse that she had been taking
     double the dose of Percocet because the prescribed amount of one tablet every six hours "did not help."
19   AR 407.  Pursuant to Dr. Lin's direction, plaintiff was asked to provide a urine sample for toxicology
     screening, but plaintiff instead left the clinic, stating that she would "go to emergency room."  AR 408.

20   [22] In November 2009, plaintiff had her first appointment with Dr. Lin, who made the observation that
     plaintiff, who was seeking a "refill of narcotics," exhibited "exaggerated pain behavior."  *See* AR 22; *see*
21   *also* AR 416-17.  A urine toxicology screening was performed that day, and plaintiff tested positive for
     cocaine and opiates.  AR 418.  A little less than three years later, during the psychological diagnostic
22   interview with Dr. Jansen in October 2012, plaintiff indicated that she had used cocaine only during her
     first marriage, AR 432, which ALJ Morris calculated as being more than a decade ago, *see* AR 24; *see*
     *also* AR 431 (indicating that plaintiff's first marriage lasted four years and her second marriage lasted
23   seventeen years).

1      **<u>Conclusion</u>**

2              For the foregoing reasons, the Commissioner's denial of DIB and SSI benefits is

3      AFFIRMED.  The Clerk is DIRECTED to enter judgment accordingly and to send a copy

4      of this Order to all counsel of record.

5              IT IS SO ORDERED.

6              DATED this 24th day of May, 2016.

7

8                                                          _____

9                                                          Thomas S. Zilly
                                                           United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 30